

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 10038

| | | |
|---|---|---|
| PETER J. GENTILE, on behalf of himself and all others similarly situated, | x : | **CLASS ACTION** |
| | : | |
| Plaintiff, | : : | **COMPLAINT FOR VIOLATIONS OF THE** |
| — against — | : : : | **FEDERAL SECURITIES LAWS** |
| PROSHARES TRUST, PROSHARE ADVISORS LLC, SEI INVESTMENTS DISTRIBUTION CO., MICHAEL L. SAPIR, LOUIS M. MAYBERG, RUSSELL S. REYNOLDS, III, MICHAEL WACHS, and SIMON COLLIER, | : : : : : : | JURY TRIAL DEMANDED RECEIVED DEC - 7 2009 U.S.D.C. S.D.N.Y. CASHIERS |
| Defendants. | : x | |

Plaintiff Peter J. Gentile, individually and on behalf of all others similarly

situated, by his attorneys, alleges the following upon information and belief, except for

those allegations as to himself, which are alleged upon personal knowledge.  The

allegations are based on counsel's investigation, documents filed with the United States

Government and Securities and Exchange Commission (the "SEC"), and reports

published in the press.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons who purchased or otherwise

acquired shares in the ProShares Ultra QQQ Fund (the "QLD Fund"), an exchange-traded

fund ("ETF") offered by Defendant ProShares Trust ("ProShares" or the "Trust"),

pursuant or traceable to ProShares' false and misleading Registration Statement,

Prospectuses, and/or Statements of Additional Information (collectively, the

"Registration Statement") issued in connection with the QLD Fund's shares (the

28167v1

"Class").  Plaintiff is seeking to pursue remedies under Sections 11 and 15 of the

Securities Act of 1933 (the "Securities Act").

     2.     ProShares consists of a portfolio of 90 ETFs, including the QLD Fund.

ETFs, regulated by the SEC under the Investment Company Act of 1940 (the "1940

Act"), are funds that track a particular stock index.  After being issued, shares in the

ETFs are bought and sold on secondary exchanges, or aftermarkets, such as the New

York Stock Exchange or NASDAQ.

     3.     Non-traditional, or so-called "leveraged" and/or "inverse" ETFs, such as

the QLD Fund, have attracted increasingly significant investor assets.

     4.     ProShares manages approximately 99 percent of the country's short and

leveraged ETFs and, overall, it is the fifth largest provider of ETFs in the United States.

ProShares designs each of its ETFs to correspond to the performance of a daily

benchmark—such as the price performance, the inverse of the price performance, or a

multiple of the inverse of the price performance—of an index or security.

     5.     ProShares' ETFs are essentially divided into two categories: Ultra and

UltraShort.

     6.     ProShares sells its Ultra and UltraShort ETFs as "simple" directional

plays.  As marketed by ProShares, Ultra ETFs are designed to go up when markets go up;

UltraShort ETFs are designed to go up when markets go down.

     7.     The QLD Fund is one of ProShares' Ultra ETFs.

     8.     The QLD Fund seeks daily investment results, before fees and expenses,

that correspond to twice (200%) the daily performance of the Nasdaq-100.  The QLD

Fund is mandated to take positions in securities and/or financial instruments that, in

combination, should have similar daily return characteristics as +200% of the daily return of the NASDAQ-100.

9.      ProShares describes its strategy as "simple" to execute.  Defendant ProShare Advisors LLC ("ProShare Advisors" or the "Advisor"), which serves as the investment advisor to the QLD Fund, purports to use a straightforward mathematical approach to investing.  Indeed, ProShares attributes its rapid growth to the "simplicity" its ETFs bring to implementing sophisticated investment strategies.  ProShares states that ProShare Advisors "determines the type, quantity and mix of investment positions that a[n ETF] should hold to simulate the performance of its daily benchmark," as opposed to advising ProShares to invest assets in stocks or financial instruments based on ProShare Advisors' view of the investment merit of a particular security, instrument, or company.

10.     The Registration Statement misled investors that the QLD Fund would deliver double the return of the NASDAQ-100.

11.     For example, in 2009, through July 30, 2009, the NASDAQ-100 increased approximately 33 percent.  Rather than increase approximately 66 percent (double), the QLD Fund has *fallen* approximately 35 percent.

12.     ProShares does not market the QLD Fund or its other ETFs as day-trading vehicles.  ProShares' Chairman has publicly stated that investors can use ProShares' ETFs "for more than a day successfully." ProShares' imposes no temporal limits on investors in its UltraShort ETFs.

13.     ProShares' Registration Statement provides hypothetical examples of fees that investors may encounter over 1-year, 3-year, 5-year, and 10-year periods, thereby

misleading investors that the QLD Fund may be used for intermediate or long-term investing.

14.     The Registration Statement did not explain that, notwithstanding the name of the QLD Fund, the investment objective of the QLD Fund, and the purpose of ProShares' UltraShort ETFs, the QLD Fund would – to a mathematical certainty – cause enormous losses if used for intermediate or long-term investing. The enormous losses are accelerated when the market becomes more volatile.

15.     The misleading nature of ProShares' statements and omissions are even more evident when compared to the statement of one of its chief competitors. In comparison to ProShares, Direxion stated on the cover of its December 29, 2008 prospectus, in bold type:

> The Funds seek *daily leveraged* investment results. The Funds are intended to be used as short-term trading vehicles. The pursuit of *daily* leveraged investment goals means that the return of a Fund for a period of longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period . . . . The Funds are not suitable for all investors. The Funds should only be used by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results and (c) who intend to actively monitor and manage their investments.

Cover page of Direxion prospectus (all emphasis in original).

16.     On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Regulatory Notice 09-31 (the "FINRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs . . . typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman

Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products . . . ." FINRA issued additional warnings on July 13, 2009, by way of a podcast on its website.

17.     Since FINRA's warnings, many financial companies, including Edward Jones & Co., UBS, Ameriprise Financial, LPL Investment Holdings Inc., Wells Fargo, Morgan Stanley Smith Barney, and Charles Schwab have either halted, or provided strongly worded warnings concerning, leveraged and/or inverse ETF trading.

18.     Moreover, seven months after Direxion issued its prospectus, ProShares changed the presentation of the statements on one of the first textual pages of a later prospectus.

19.     In a July 31, 2009 prospectus, ProShares stated that "The Fund seeks investment results **for a single day only**" and "**The Funds do not seek to achieve their stated investment objective over a period of time greater than one day.**" (Emphasis in original in both examples). These statements were still misleading because, among other things, they omitted that shares in the ETFs should only be used as short-term trading vehicles. Nonetheless, these statements, and the fact that they were now in bold, demonstrates that the earlier statements of "risk" were misleading.

20.     On August 18, 2009, the SEC issued an alert that began by stating: "The SEC staff and FINRA are issuing this Alert because we believe individual investors may be confused about the performance objectives of leveraged and inverse exchange-traded funds (ETFs). Leveraged and inverse ETFs typically are designed to achieve their stated performance objectives on a daily basis. Some investors might invest in these ETFs with the expectation that the ETFs may meet their stated daily performance objectives over the

long term as well. Investors should be aware that performance of these ETFs over a period longer than one day can differ significantly from their stated daily performance objectives."

21.     The SEC alert also stated: "Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis. Their performance over longer periods of time—over weeks or months or years—can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time. This effect can be magnified in volatile markets."

22.     The SEC alert provided "two real-life examples" to "illustrate how returns on a leveraged or inverse ETF over longer periods can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time."

23.     The SEC alert states: "While there may be trading and hedging strategies that justify holding these investments longer than a day, buy-and-hold investors with an intermediate or long-term time horizon should carefully consider whether these ETFs are appropriate for their portfolio. As discussed above, because leveraged and inverse ETFs reset each day, their performance can quickly diverge from the performance of the underlying index or benchmark. In other words, it is possible that you could suffer significant losses even if the long-term performance of the index showed a gain."

24.     As a result of ProShares' misleading Registration Statement, Plaintiff and the Class have suffered millions of dollars in losses.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the QLD Fund trade in this District on the New York Stock Exchange.

28.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

29.     Plaintiff Peter J. Gentile purchased shares of the QLD Fund pursuant to or traceable to the Registration Statement, and suffered harm thereby.

30.     Defendant ProShares, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, is a Delaware statutory trust organized on May 29, 2002.

31.     ProShares is registered with the SEC as an open-end management investment company under the 1940 Act. ProShares has a portfolio of ETFs, the shares of which are all listed on the American Stock Exchange. Each ProShares ETF has its own CUSIP number and exchange trading symbol. Each ProShares ETF issues and redeems shares on a continuous basis at net asset value ("NAV") in large, specified numbers of shares called "Creation Units." For each ETF, a Creation Unit is comprised

26148v1                                        7

of 75,000 shares. ProShares now manages over $20 billion, accounting for 99 percent of the country's short and leveraged ETFs.

32.      Defendant ProShare Advisors, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to the QLD Fund. ProShare Advisors provides investment advice and management services to ProShares and its ETFs, including the QLD Fund. ProShare Advisors oversees the investment and reinvestment of the assets in the QLD Fund.

33.      ProShare Advisors is owned by Defendants Michael L. Sapir ("Sapir"), Louis M. Mayberg ("Mayberg") and William E. Seale.

34.      Defendant SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley Drive, Oaks, Pennsylvania, 19456, is the distributor and principal underwriter for the QLD Fund. SEI has been registered with the SEC and FINRA since 1982. SEI was hired by ProShares to distribute shares of the QLD Fund to broker/dealers and, ultimately, shareholders.

35.      Defendant Sapir, an interested trustee of ProShares, has been the Chairman and Chief Executive Officer of ProShare Advisors since its inception. Sapir signed the Registration Statement.

36.      Defendant Mayberg has been President of ProShare Advisors since inception. Mayberg signed the Registration Statement.

37.      Defendant Russell S. Reynolds, III ("Reynolds") is a non-interested trustee of ProShares who signed the Registration Statement.

38.      Defendant Michael Wachs ("Wachs") is a non-interested trustee of ProShares who signed the Registration Statement.

39.     Defendant Simon D. Collier ("Collier") has been ProShares' Treasurer since June 2006.  In his capacity as Treasurer, Collier signed the Registration Statement.

40.     These individual people are referred to as the "Individual Defendants."

41.     The Individual Defendants, in their respective roles, controlled the operations of the QLD Fund.  The Board of Trustees of ProShares is responsible for the general supervision of all of the QLD Fund.  The officers of ProShares are responsible for the day-to-day operations of the QLD Fund.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the QLD Fund pursuant or traceable to the Trust's false and misleading Registration Statement, and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Trust, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

47.     Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and/or operations of ProShares; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

49.     Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**Traditional ETFs**

50.     ETFs are open-ended, with a unique creation and redemption feature that provides for the creation of large blocks of ETF shares only by authorized participants,

which are usually institutional investors, specialists or market makers, who signed a participant agreement with a particular ETF sponsor or distributor to satisfy investor demand and provide market liquidity.  ETFs are frequently considered low cost index mutual funds that trade like stocks.  ETFs, however, differ from traditional mutual funds in the following ways:

        (a)     ETFs do not sell individual shares directly to investors and only issue shares in large blocks (of 50,000 shares, for example) that are known as "Creation Units";

        (b)     Investors generally do not purchase Creation Units with cash. Instead, investors buy Creation Units with a basket of securities that generally mirrors an ETF portfolio;

        (c)     After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on a secondary market.  This permits other investors to purchase individual shares of the ETF (instead of Creation Units); and

        (d)     Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the Creation Units back to the ETF.  ETFs generally redeem Creation Units by giving investors the securities that comprise the portfolio instead of cash.

      51.     In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or SPDR), which tracked the S&P 500.  Soon after, more ETFs were introduced to the market, for example the Diamonds ETF in 1998, which tracked the Dow Jones Industrial Average, and the Cubes in 1999, which tracked the NASDAQ 100.

**Non-Traditional/Leveraged ETFs**

52.    Non-traditional, or leveraged ETFs are a new form of ETFs that seek to deliver multiples of the performance of the index or benchmark they track. Some leveraged ETFs are "inverse" or "short" funds, meaning that they seek to deliver the opposite of the performance of the index or benchmark they track. Like traditional ETFs, some inverse ETFs track broad indices, some are sector-specific, and still others are linked to commodities or currencies. Inverse ETFs are often marketed as a way for investors to profit from, or at least hedge their exposure to, downward moving markets.

53.    Some non-traditional ETFs are both short and leveraged, meaning that they seek to achieve a return that is a multiple of the inverse performance of the underlying index. An inverse ETF that tracks the S&P 500, for example, seeks to deliver the inverse of the performance of the S&P 500, while a double-leveraged inverse S&P 500 ETF seeks to deliver twice the opposite of that index's performance. To accomplish their objectives, leveraged and inverse ETFs pursue a range of complex investment strategies through the use of swaps, futures contracts and other derivative instruments.

54.    Most leveraged and inverse ETFs "reset" daily. This results in "compounding" effects. Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day. In the first case with low volatility, the inverse ETF loses 0.02 percent; but, in the more volatile scenario, the inverse ETF loses 1.82 percent. The divergence effect increases significantly as volatility increases.

## SUBSTANTIVE ALLEGATIONS

**A.     ProShares' Non-Traditional Ultra ETFs**

55.     ProShares describes its Ultra ETFs as vehicles that "[g]et more exposure for your investment dollars with the first ETFs designed to double the daily performance of popular market indexes (before fees and expenses)."

**B.     The QLD Fund**

56.     The Registration Statement stated that the QLD Fund seeks daily investment results, before fees and expenses, that correspond to twice (200%) the daily performance of the NASDAQ-100.

57.     For example, in 2009, through July 30, 2009, the NASDAQ-100 increased approximately 33 percent.  Rather than increase approximately 66 percent (double), the QLD Fund has *fallen* approximately 35 percent.

58.     The Registration Statement omitted that holding shares of the QLD Fund for any period more than a day will – to a mathematical certainty – not track the market. Indeed, holding shares over a long-period of time will lead to enormous losses to a mathematical certainty.

59.     Investors did not view ETFs as day trading investment vehicles and did not day trade the QLD Fund.  In fact, it is virtually economically impossible for all QLD Fund purchasers to sell out of their positions at the end of one day.

**C.     The False and Misleading Registration Statement**

60.     On or about January 30, 2007, ProShares filed the Registration Statement, which was continually updated.  The January 30, 2007 prospectus was signed by the Individual Defendants.

61.     A later prospectus, filed on September 30, 2008, stated, in pertinent part:

Investment Objective

ProShares Ultra QQQ seeks daily investment results, before fees and expenses, that correspond to twice (200%) the daily performance of the NASDAQ-100 Index.

If ProShares Ultra QQQ is successful in meeting its objective, its net asset value should gain approximately twice as much, on a percentage basis, before fees and expenses, as the NASDAQ-100 Index when the Index rises on a given day. Conversely, its net asset value should lose approximately twice as much, on a percentage basis, before fees and expenses, as the Index when the Index declines on a given day.

Principal Investment Strategies

ProShares Ultra QQQ's principal investment strategies include:

• Investing in equity securities and/or financial instruments (including derivatives) that ProShare Advisors believes, in combination, should have similar daily return characteristics as twice (200%) the daily return of the NASDAQ-100 Index. Information about the Index can be found in the section entitled "Underlying Indexes."

• Committing at least 80% of its net assets, including any borrowings for investment purposes, under normal circumstances, to equity securities contained in the Index and/or financial instruments that, in combination, should have similar economic characteristics.

• Employing leveraged investment techniques and/or sampling techniques in seeking its investment objective.

• Investing assets not invested in equity securities or financial instruments in debt securities and/or money market instruments.

• The Fund will concentrate its investments in a particular industry or group of industries to approximately the same extent as the Index is so concentrated.

62.    The September 30, 2008 prospectus discussed a laundry list of risks, but left out a clear discussion of the most crucial one – how investing in the QLD Fund for more than one day would invariably lead to swift and radical losses:

Principal Risks

ProShares Ultra QQQ is subject to the following principal risks:

• Aggressive Investment Technique Risk, Correlation Risk, Counterparty Risk, Credit Risk, Early Close/Trading Halt Risk, Equity Risk, Investment Company and Exchange Traded Fund Risk, Liquidity Risk, Market Price Variance Risk, Market Risk, Non-Diversification Risk, Portfolio Turnover Risk and Technology Investment Risk.

63.     The statements in paragraphs 61 and 62 were false and/or misleading because they failed to disclose that: (1) if shares of the QLD Fund were held for a time period longer than one day, the likelihood of catastrophic losses was huge; and (2) the extent to which performance of the QLD Fund would inevitably diverge from the performance of its benchmark—i.e., the overwhelming probability, if not certainty, of spectacular divergence.

64.     The inadequacy of Proshares' list of risks is made obvious when compared to that of Direxion, which stated on the cover of its December 29, 2008 prospectus, in bold type:

> **The Funds seek *daily leveraged* investment results.  The Funds are intended to be used as short-term trading vehicles.  The pursuit of *daily* leveraged investment goals means that the return of a Fund for a period of longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period….  The Funds are not suitable for all investors.  The Funds should only be used by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results and (c) who intend to actively monitor and manage their investments.**

Cover page of Direxion prospectus (all emphasis in original).

65.     As discussed above, ProShares changed – but did not cure – the presentation of its statements.  On July 31, 2009, ProShares stated that "[t]he Fund seeks investment results **for a single day only**" and "[t]**he Funds do not seek to achieve their stated investment objective over a period of time greater than one day.**"  (Emphasis

in original in both examples). These statements were still misleading – indeed, these statements were in earlier prospectuses (unbolded) in the risk section, but it demonstrates that the earlier discussions of risk were misleading. These statements were still misleading because they did not disclose that using the QLD Fund for anything else besides one day was almost mathematically certain to cause radical losses in a volatile market such as that underlying the QLD Fund.

**D.     Statement by FINRA & Others**

66.    In June 2009, FINRA issued Regulatory Notice 09-31, in which FINRA "remind[ed] firms of their sales practice obligations in connection with leveraged and inverse ETFs." In particular, FINRA admonished that sales materials related to leveraged and inverse ETFs "must be fair and accurate." FINRA further cautioned:

> **Suitability**
>
> NASD Rule 2310 requires that, before recommending the purchase, sale or exchange of a security, a firm must have a reasonable basis for believing that the transaction is suitable for the customer to whom the recommendation is made. This analysis has two components. The first is determining whether the product is suitable for any customer, an analysis that requires firms and associated persons to fully understand the products and transactions they recommend.
>
> **Communications With the Public**
>
> NASD Rule 2210 prohibits firms and registered representatives from making false, exaggerated, unwarranted or misleading statements or claims in communications with the public.
> Therefore, all sales materials and oral presentations used by firms regarding leveraged and inverse ETFs must present a fair and balanced picture of both the risks and benefits of the funds, and may not omit any material fact or qualification that would cause such a communication to be misleading.

67.    FINRA spokesman Herb Perone has stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing

products, and the marketing and sale of these products to unsophisticated retail investors is very much on FINRA's radar screen."

68.    FINRA issued additional guidance on July 13, 2009, by way of a podcast on its website. FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis—but with the effects of compounding over a longer time frame, results differ significantly. In spite of this admonishment, Defendant Sapir maintains that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

69.    On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sales practices of ProShares, among other firms heavily involved in structuring leveraged ETFs.

70.    On July 21, 2009, as reported by *The Wall Street Journal* in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. called ETFs like the QLD Fund "one of the most misunderstood and potentially dangerous types of ETFs."

71.    On July 27, 2009, in a letter to wealth management clients, as reported by *The Wall Street Journal* in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell an underlying asset short. Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs that seek more than twice the long or short performance of their target index. Wells Fargo is now also reportedly reviewing its policy on non-traditional ETFs.

72.     On July 30, 2009, *The Wall Street Journal* published an article entitled "Warning Signs Up For Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs.  The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs.  Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting . . . .  Proceed with extreme caution."

73.     The statements in the Registration Statement are misleading and the risk disclosures do not come close to this "[p]roceed with extreme caution" level of clarity.

74.     On August 1, 2009, *The Wall Street Journal* quoted Morningstar's director of ETF analysis, Scott Burns, who observed:  "Hedges [like the QLD Fund] aren't supposed to become less trustworthy when you really need them."

## CLAIM ONE
### Violations of § 11 of the 1933 Act Against All Defendants

75.     This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

76.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Claim is asserted against all defendants.

77.     ProShares is the issuer of the shares sold via the Registration Statement. The Individual Defendants are signatories and/or authorizers of the Registration Statement.

78.     Plaintiff and the Class all purchased shares of the QLD Fund issued pursuant and/or traceable to the Registration Statement.

79.     Defendants are liable for the material misstatements in and omissions from the Registration Statement.

80.     Plaintiff and other members of the Class purchased or otherwise acquired their QLD Fund shares without knowledge of the untruths or omissions alleged herein.

**CLAIM TWO**
**Violations of § 15 of the Securities Act Against the Individual Defendants**

81.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

82.     Each of the Individual Defendants named herein acted as a controlling person of the Company within the meaning of Section 15 of the Securities Act. The Individual Defendants were trustees, officers, and/or directors of ProShares charged with the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause the controlled person to engage in the unlawful acts and conduct complained of herein.

83.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the QLD Fund.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  December 7, 2009          **BERNSTEIN LIEBHARD LLP**

By: _____
    Sandy A. Liebhard (liebhard@bernlieb.com)
    U. Seth Ottensoser (ottensoser@bernlieb.com)
    Joseph R. Seidman, Jr. (seidman@bernlieb.com)
    10 East 40th Street
    22nd Floor
    New York, New York 10016
    Telephone:  (212) 779-1414
    Facsimile:  (212) 779-3218

PAGE 1 OF 2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PETER J. GENTILE ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) in the **PROSHARES ULTRA QQQ (QLD)** security that is the subject of this action are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| SEE ATTACHMENT | | | | |
| 170 | QLD | Buy $16067.00 | 8/13/07 | $94.51 |
| 30 | QLD | Buy $2835.00 | 8/13/07 | $94.50 |

Please list other transactions on a separate sheet of paper, if necessary.
(SEE SEPARATE SHEET FOR OTHER QLD TRANSACTIONS)

5.      During the three years prior to the date of this Certification, Plaintiff has not served as a lead plaintiff in an action filed under the federal securities laws.

6.      The undersigned is authorized to sign this Certification on behalf of Plaintiff.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 06 day of September, 2009.

Signature  _Peter J. Gentile_

Print Name  Peter J. Gentile

26147v1

## QLD TRANSACTIONS FOR MR. PETE GENTILE

| NO.OF SHARES | STOCK SYMBOL | BUY/SELL | DATE..PRICE/SHARE | |
|---|---|---|---|---|
| 200 | QLD | SOLD | 11/12/2009 $10,943.00 | $54.71 |
| 170 | QLD | BUY | 10/24/2007 $10,069.00 | $114.31 |

*Peter J. Gentile*

Peter J. Gentile